UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x
In re:                                                  :
                                                        :     Chapter 11
    JOCELYN WILDENSTEIN,                         :
                                                        :     Case No. 18-10766 (MEW)
                       Debtor.   :
------------------------------------------------------------x
REGAL JEWELRY AND GIFT SHOP, LLC,                       :
                                                        :
                      Plaintiff,     :
                                                        :     Adv. Proc. No. 18-01615 (MEW)
        - against -                                 :
                                                        :
JOCELYN WILDENSTEIN,                                    :
                                                        :
                      Defendant.     :
------------------------------------------------------------x

## DECISION AFTER TRIAL

A P P E A R A N C E S:

LAZARUS & LAZARUS P.C.
New York, New York
By: Harlan Lazarus, Esq.
  *Attorneys for Regal Jewelry and Gift Shop, LLC*

REED SMITH LLP
New York, New York
By: Michael J. Venditto
  *Attorneys for Jocelyn Wildenstein*

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

      Plaintiff Regal Jewelry and Gift Shop, LLP ("**Regal**") seeks, among other things, an order and judgment declaring that a debt owed by debtor Jocelyn Wildenstein ("**Wildenstein**") in the amount of $268,000 should be excepted from discharge pursuant to 11 U.S.C. § 523. Regal also seeks pre-judgment and post-judgment interest, reasonable attorneys' fees, costs and

1

expenses. For the reasons set forth below, the Court finds in favor of Regal and will enter judgment accordingly.

## Jurisdiction and Power to Enter a Final Judgment

The parties have agreed that this Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334 and that this adversary proceeding is a "core" proceeding pursuant to 28 U.S.C. § 157(b)(2)(I). The parties have also consented to the entry of final orders or judgment by this Court. In light of the parties' consent this Court has the power to enter a final decision. *See* 28 U.S.C. § 157(d); *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1942, 1949 (2015).

## Stipulated Facts

Many of the relevant facts are not disputed and are the subject of stipulations set forth in the Amended Joint Pre-Trial Order [ECF No. 29].

Wildenstein previously resided in an apartment at Trump World Tower in New York. At the times relevant to this proceeding she resided with an individual named Lloyd Klein ("**Klein**"). On or about November 14, 2017, Klein delivered to Regal four post-dated checks that were signed by Wildenstein and drawn on the account of an entity named JW51AE, LLC. The checks were issued to evidence Wildenstein's obligation to pay Regal for certain jewelry that she had agreed to purchase. Each check was in the amount of $62,500, and the four checks were dated January 7, 2018, February 7, 2018, March 7, 2018 and April 7, 2018, respectively. Wildenstein admits that she knew, on the day the checks were issued, that the JW51AE, LLC account did not then hold sufficient funds to cover the checks.

The parties also agree that beginning on November 16, 2017 and continuing thereafter, Klein communicated with representatives of a pawn broker named BLCE, LLC d/b/a New York Loan Company ("**BLCE**") to obtain loans that were to be secured by the jewelry that Wildenstein had agreed to purchase with the post-dated checks. Klein pledged the jewelry to

BLCE as collateral for loans in the total amount of $70,000.00. The loan monies were paid from BLCE to Wildenstein and to the account of JW51AE, LLC. Wildenstein has stipulated that she knew about the pawn transactions and the loans at some time in 2017, though she did not stipulate as to whether she knew of the transactions before Klein arranged them.

The JW51AE, LLC check dated January 7, 2018 was not paid by Citibank when it was presented for payment. Regal did not negotiate any of the checks after January 7, 2018. However, between January 2018 and April 2018, Regal tried to obtain payment for the jewelry or the return of the jewelry from Wildenstein and Klein and, eventually, from Wildenstein's counsel. The jewelry was never returned to Regal, and no payment was made to Regal.

Throughout the period from November 22, 2017 through at least June 28, 2018, the jewelry was in BLCE's possession, custody and control. The parties have stipulated that Wildenstein and Klein could not and did not redeem the jewelry from BLCE, though they did not explain why Wildenstein and Klein "could not" do so (except possibly due to lack of funds). BLCE eventually sold the jewelry for $100,000.00 to DBS Diamonds Inc. and remitted $5,530.00 to Klein for the surplus monies from that sale, which sum has not been paid to Regal. DBS Diamonds Inc. then sold the jewelry for $126,000.00 to Bijan & Co. Inc.

Wildenstein admits that she is indebted to Regal in the amount of $268,000.00. The only issue is whether the debt is subject to discharge in Wildenstein's bankruptcy case.

### Findings of Fact

The Court held a trial of this matter on January 28, 2021. Jack Zebede, the sole owner and proprietor of Regal, testified at the trial and was subject to cross-examination. The parties also submitted excerpts from the deposition testimony of Wildenstein and Klein, and twenty exhibits were accepted into evidence. I have considered the testimony and exhibits and make the following findings of fact to supplement the stipulated facts set forth above.

Wildenstein and Klein are not married but they lived together for 15 years or more and once were engaged. They lived together at the times relevant to this dispute, and they shared homes in Miami and in New York.

Regal rented retail space on the ground level of the Pierre Hotel. Zebede met Wildenstein and Klein when they stopped to look at jewelry through a display window and Zebede invited them in. They spoke for a while and Zebede exchanged cards with Klein, but Wildenstein did not purchase any items. Wildenstein and Klein visited the Regal shop on another occasion, at which time Wildenstein admired a five-piece emerald and diamond suite. However, Wildenstein did not purchase the items at that time.

Zebede became friendly with Klein and they met from time to time for lunch, coffee or drinks. In the latter part of 2017, Wildenstein and Klein made an appointment to visit with Zebede at the Regal shop for the purpose of looking again at the five-piece emerald and diamond suite. Zebede quoted a price of $300,000. Wildenstein and Klein did not purchase the items, but instead offered to assist Zebede in selling them. They told Zebede that Wildenstein had connections with Sotheby's and Christie's and that if Zebede would bring the items to Wildenstein's apartment she would arrange to have the items appraised for a possible auction sale. They also suggested that the items might be sold for higher prices if Wildenstein's name were to be associated with them at auction. Wildenstein and Klein proposed that if the items sold for $300,000 then Zebede would get all the proceeds, but that if a higher price were obtained then the excess proceeds would be split, with one-third going to Zebede, one-third to Wildenstein and one-third to Klein.

Zebede took the emerald and diamond suite to Wildenstein's apartment in September 2017, but the appraisers from Sotheby's and Christie's did not suggest a sufficiently high price to

4

make Zebede interested in putting the items up for auction. A few weeks later, however, Klein called Zebede and asked if he would agree to allow Wildenstein to wear the emerald and diamond suite to an impressionist art auction to be held at Sotheby's. Zebede agreed, and he delivered the items to Klein along with a receipt that noted a value of $250,000 and included the notation "Suite for exhibition." (PX 3.) Klein signed the receipt, and Wildenstein wore the items to the auction. The record is not perfectly clear as to the date of the Sotheby's event or the date when the items were delivered by Zebede, but the receipt "for exhibition" is dated November 14, 2017 and Zebede testified that he delivered the items on that date, and the Court finds that he did so.

Klein called Zebede one or two days after the Sotheby's event and told Zebede that Wildenstein loved the jewelry and did not want to return it. Klein told Zebede that Wildenstein was in the process of selling her apartment, and proposed to pay for the items by delivering a series of post-dated checks, the first of which would be payable in January 2018. Zebede balked and asked for immediate payment, but Klein told him that a contract to sell Wildenstein's apartment had been signed and that the sale would bring in $11 million or more, and that the offer to pay with post-dated checks was a "take it or leave it" proposition because it was more convenient for Wildenstein and Klein to make payment in this way.

Zebede relented, and Klein brought the checks to the Regal shop. Copies of the checks were admitted into evidence as PX 4. When Klein delivered the checks he admired a diamond chain, and Zebede agreed to sell the chain as well. Zebede added the chain to the prior November 14, 2017 receipt at a price of $18,000. The diamond chain and the emerald and diamond suite collectively comprise the "Jewelry" that is subject to this dispute. Klein told Zebede that he did not have a check to cover the cost of the diamond chain but that Wildenstein

5

was "good for" the payment for the extra item, and Zebede agreed. As noted above, Wildenstein has stipulated that she is indebted to Regal in an amount that covers this additional item.

The record is not completely clear as to when the post-dated checks were delivered to Regal. The parties stipulated in the Joint Pretrial Order that the checks were delivered "on or about November 14, 2017." However, Zebede testified at trial that he believed the delivery occurred at the end of November 2017. Zebede's prior testimony (to the effect that the conversation with Klein occurred a few days after the Sotheby's event) suggests the delivery could have been as early as November 16 or so, but did not likely occur on November 14.

The record does makes clear that on November 16, 2017 Klein sent a photograph of the emerald and diamond suite to BLCE, along with a copy of an appraisal report. A representative of BLCE texted back that he was stepping into a meeting but would "work on it shortly." *See* PX 25. On November 22, 2017, Klein delivered four of the five parts of the emerald and diamond suite (excluding an emerald pendant) to BLCE as collateral for a loan in the amount of $50,000. *See* PX 26. The loan had a due date of March 22, 2018.

Klein contacted BLCE again on November 30, 2017, stating that "Jocelyn needs a little more cash" and asking if he could bring the pendant and the diamond chain he had obtained from Zebede to BLCE as collateral for an additional loan. On December 4, 2017, Klein delivered the emerald pendant, plus the diamond chain, as collateral for a loan in the amount of $20,000. *See* PX 27. The $20,000 loan had a due date of April 4, 2018. *Id.*[1]

Klein was listed as the borrower on each loan, but BLCE issued two checks to the order of "Jocelyn Wildenstein JW1AE LLC" that were offered in evidence. *See* PX 28. One check

---

[1] The parties stipulated in the Amended Joint Pretrial Order that the loans were made on November 22, 2017 (ECF. No. 29, ¶ 7, at p. 3), but the documentary evidence plainly shows that there were two separate loans on two separate dates.

(dated November 22, 2017) was in the amount of $25,000, and the other check (dated December 4, 2017) was in the amount of $10,000. The record contains no explanation of why the first check was less than the amount of the first loan. However, the parties have stipulated in the Joint Pretrial Order that all of the proceeds of the loans were paid to Wildenstein.

Wildenstein testified at her deposition that she believed she would sell her apartment in late 2017 and that she believed, when the checks were issued, that the proceeds of the apartment sale would provide sufficient funds to cover the checks in the future. However, neither party offered any evidence as to whether or not a contract for sale of the apartment had actually been signed, or as to what the status of the purported sale was. Nor did the parties present evidence as to Wildenstein's finances in November 2017. On the other hand, the relevant bank records show that the JW51AE, LLC account on which the checks were written had very little funds both before and after November 2017. In addition, the harsh financial terms of the pawn transactions with BLCE – which required the payment of finance charges of more than $14,000 for a four-month loan of $70,000, which is an effective annual rate of interest of 60% – are not loan terms to which persons of ample resources would normally agree, and are indications of financial desperation.

Klein invoked his fifth amendment privilege against self-incrimination in response to many of the questions he was asked at his deposition about these matters. Regal has asked me to draw adverse inferences from Klein's invocation of the Fifth Amendment, and Wildenstein has argued that I should not draw adverse inferences against Wildenstein based on Klein's actions. I do not need to resolve that legal issue, however, because after reviewing all of the testimony I do not need to draw adverse inferences in order to make the factual determinations that are relevant for this Decision. I find from the evidence that at all relevant times Klein acted in concert with

7

Wildenstein and with her full knowledge, participation and approval.  When Klein and Wildenstein contacted Zebede after the Sotheby's event to discuss a purchase of the emerald and diamond suite their actual plan was to use that jewelry as collateral for a short-term loan from BLCE.  They did not disclose this to Zebede.  Instead, they represented that Wildenstein wished to purchase the emerald and diamond suite because she admired it and wanted to own it for her own use.  Zebede negotiated with them in good faith with the understanding that Wildenstein would retain possession of the jewelry and that the proposed deferred payments were purely matters of convenience.  I asked Wildenstein's counsel (at the end of the trial) whether he believed that Zebede would have agreed to sell the Jewelry and to accept four post-dated checks if he'd known that Wildenstein and Klein did not wish to buy the Jewelry for its own sake and that they instead wanted to use the Jewelry as collateral to obtain high-interest, short-term loans from a pawn broker; counsel admitted that Zebede likely would not have done so, and I find that Zebede would not have done so.  I also find that if Zebede had known that Wildenstein and Klein planned to use the $250,000 emerald and diamond suite as collateral for a short-term loan from a pawn broker then Regal (through Zebede) would not have extended credit for the purchase of the additional $18,000 diamond chain.

In fact, Wildenstein and Klein never told Zebede that they had pawned the Jewelry. When Zebede attempted to deposit the first of the post-dated checks (in January 2018), the check bounced.  Over the next several months Zebede pleaded with Klein and Wildenstein either for payment or for a return of the Jewelry.  Klein and Wildenstein repeatedly represented that they had possession of the Jewelry (which was false), that they would return the Jewelry if that is what Zebede wanted (which they could not do and which was also false), that there was no issue as to Wildenstein's ability to pay because she was a billionaire, that wire transfers had been sent

8

but had somehow failed to go through (which was false), and that Zebede should just be patient. In short, they repeatedly offered false reassurances to keep Zebede at bay. *See, e.g.,* text messages offered as PX 29.

### **Procedural History**

An involuntary chapter 7 bankruptcy petition was filed against Wildenstein on March 20, 2018 (Case No. 18-10766). Wildenstein then filed her own voluntary chapter 11 petition on May 4, 2018 (Case No. 18-11388). Wildenstein's chapter 11 case was consolidated with the prior case and the prior case was deemed to have been converted to a chapter 11 case. At the time of Wildenstein's bankruptcy filing BLCE still had possession of the Jewelry. However, the schedules of assets and liabilities that Wildenstein filed with her bankruptcy petition did not list the Jewelry or the BLCE secured claim. *See* Case No. 18-11388, ECF No. 1. Those schedules also did not list the debt that Wildenstein owed to Regal. *Id*.

At a court conference on May 16, 2018, counsel to Wildenstein acknowledged that Regal had inquired about the Jewelry and stated that "[w]e were *[sic]* trying to have the jewelry returned to Regal" but that they were still looking into the issue. *See* May 18, 2018 Tr. (Case No. 18-10766, ECF No. 19) at 12:15 – 14:5. The Jewelry was not returned, and Regal filed a motion on May 24, 2018, seeking discovery to assist in determining the status and location of the Jewelry. Case No. 18-10766 at ECF No. 18. The Court held a hearing on that motion on June 20, 2018, at which time Regal's counsel stated that he had been told by Wildenstein's counsel that the Jewelry was in a safe deposit box and that Regal hoped to work out a settlement that would include a return of the Jewelry. *See* June 20, 2018 Tr. (Case No. 18-10766 at ECF No. 66) at 7:19 – 8:21. In fact, as the parties have stipulated, the Jewelry was still in the possession of BLCE at the time of the hearing.

Regal subsequently complained (by letter dated July 2, 2018) that it had been told for the first time on June 29, 2018 that an unidentified third party had possession of the Jewelry and had refused to release it except upon a payment of $80,000. *See* Case No. 18-10766 at ECF No. 33. Wildenstein's counsel filed a responsive letter that for the first time revealed the identity of BLCE as the party who had possession of the Jewelry. Regal then learned (upon contacting BLCE) that BLCE had already sold the Jewelry pursuant to the terms of the pawn transaction. *See* Case No. 18-10766 at ECF Nos. 34, 35.

Regal filed the Complaint in this adversary proceeding on August 13, 2018. Regal contends that the debt owed by Wildenstein is excepted from discharge under a number of different theories. More particularly:

- Regal contends that Wildenstein inflicted a "willful and malicious injury" on Regal or on Regal's property and that discharge would be inappropriate pursuant to 11 U.S.C. § 523(a)(6);

- Regal contends that Wildenstein acquired the Jewelry by "larceny" or by "embezzlement" and that discharge is inappropriate pursuant to 11 U.S.C. § 523(a)(4);

- Regal contends that Wildenstein obtained the Jewelry by false pretenses or by false promise or by "actual fraud," and that discharge is inappropriate pursuant to 11 U.S.C. § 523(a)(2)(A);

- Regal contends that Wildenstein obtained the Jewelry by use of a false written statement regarding financial condition, and that discharge is inappropriate pursuant to 11 U.S.C. § 523(a)(2)(B).

10

## Discussion

I. **Burden of Proof.**

A creditor seeking to prove that a debt is excepted from discharge under § 523(a) must do so by a preponderance of the evidence. *See Ball v A.O. Smith Corp.,* 451 F3d 66, 69 (2d Cir 2006). Wildenstein argues that the portions of Regal's contentions that are based on allegations of fraud, larceny or embezzlement should instead require proof based on a "clear and convincing evidence" standard. *See* Defs'. Post-Trial Mem. (ECF No. 30) at 6 (*citing Great Am. Insur. Co. v. Graziano (In re Graziano)*, 35 B.R. 589, 593 (Bankr. E.D.N.Y. 1983). It is true that if Regal were suing in the New York State courts to establish the existence of a debt based on contentions of fraud it would need to prove its case based on clear and convincing evidence. *Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 491 (2d Cir. 2014) (citing *Gaidon v. Guardian Life Insurance Co. of America*, 94 N.Y.2d 330, 349–50 (1999); *see also Waran v Christie's Inc.*, 315 F Supp 3d 713, 718 (S.D.N.Y. 2018). However, the existence of the debt is not at issue here; Wildenstein has admitted that she owes a debt to Regal. The only issue in this proceeding is whether that admitted debt should be excepted from discharge based on fraud or for other reasons. The dischargeability of the debt is a matter of federal law (not state law), and the United States Supreme Court has squarely held that in order to show that a debt should be excepted from discharge on the ground of fraud a plaintiff need only prove fraud by a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 286-90 (1991). The contrary authorities that were cited by Wildenstein all pre-date the Supreme Court's decision in *Grogan* and are inapposite.

II. **The Asserted Claims.**

Some of the theories upon which Regal has relied are plainly not relevant to this case. "Larceny" would require a showing that Wildenstein engaged in a wrongful taking of property

11

belonging to another person without that person's consent and with the intent to convert the property. *See JP Morgan Chase Bank, NA v. Selig (In re Selig)*, 8-17-70042-REG, 2018 WL 889350, at *6 (Bankr. E.D.N.Y. Jan. 24, 2018). The evidence plainly showed, however, that Wildenstein obtained the Jewelry pursuant to a purchase transaction, and that Zebede voluntarily gave possession of the Jewelry to Wildenstein. Zebede contends that he was defrauded and deceived by false pretenses, that his consent should be treated as involuntary, and that the alleged fraud therefore should be equated with "larceny." But "fraud" and "false pretenses" are their own separate grounds for an exception from discharge, so Regal's attempt to equate fraud and false pretenses with "larceny" adds nothing to Regal's case.

Proof of "embezzlement" requires proof that property was entrusted to Wildenstein for her care and that she subsequently appropriated that property for her own use and without the owner's consent. *See Moonan v. Bevilacqua (In re Bevilacqua)*, 53 B.R. 331, 333-34 (Bankr. S.D.N.Y. 1985); *Bioconvergence LLC v. Attariwala (In re Attariwala)*, No. 19-00828, 2020 WL 3443808, at *2 (Bankr. D.C. 2020). Again, however, the evidence showed that the parties engaged in a purchase transaction. The Jewelry was sold to Wildenstein (not "entrusted" to her) and was transferred with the understanding and agreement that she would put it to her own use. Once again, Regal argues that Wildenstein committed fraud, that his consent should be treated as involuntary and that the alleged fraud should be equated with embezzlement. But as stated above, fraud and false pretenses are their own separate grounds for an exception to discharge, so Regal's attempt to equate them with "embezzlement" adds nothing to its case.

Regal has also argued that Wildenstein willfully and maliciously injured Regal or Regal's property and that the debt is excepted from discharge for that reason. *See* 11 U.S.C. § 523(a)(6). Proof of a "deliberate or intentional action that leads to injury" is not sufficient to except a debt

12

from discharge under section 523(a)(6); instead, Regal must show that Wildenstein not only acted wrongfully, but that she actually intended to inflict an injury. *See Kawaauhau v. Geiger*, 523 U.S. 57, 61-62 (1998). Regal argues that a monetary injury that is deliberately inflicted (through fraud, for example) may constitute a "willful and malicious injury" to property for purposes of § 523(a)(6). But if Regal proves "fraud" or "false pretenses" in connection with the underlying debt then there is no point to giving further consideration of whether Wildenstein not only committed an intentional wrong but also intended to injure the victim.

Regal has also contended that Wildenstein obtained the Jewelry by use of a false written statement regarding her financial condition. However, there is no evidence that Wildenstein did so. The only written documents that were identified were the post-dated checks that Wildenstein issued. Those were not "financial statements" and they were not (by themselves) statements of financial condition. They also could not reasonably be construed as representations that the underlying bank accounts already held sufficient sums to cover the checks, because Wildenstein and Klein made it quite clear that the whole reason they wanted to post-date the checks was so that they could first obtain an infusion of funds through the sale of Wildenstein's apartment.

Regal's real claim is that Wildenstein obtained the Jewelry from Regal, and obtained an extension of credit by Regal, through actual fraud or through false pretenses. Proof of actual fraud requires proof that (1) the debtor made representations; (2) those representations were false when they were made; (3) the debtor intended to deceive the creditor; (4) the creditor relied on the misrepresentations; and (5) the creditor sustained losses as a result. *Matter of Selenberg*, 856 F.3d 393, 398 (5th Cir. 2017). Regal argues that Wildenstein falsely represented that the post-dated checks would clear in the future when presented for payment. Certainly Wildenstein had greater knowledge than Zebede had about the risks that Zebede was taking by accepting the post-

13

dated checks. However, the evidence fell short of proving that Wildenstein actually believed (in November 2017) that the checks would bounce when presented for payment in the future. Regal also contends that Wildenstein and Klein lied about Wildenstein's financial condition, but misrepresentations about financial condition are only grounds for an exception from discharge if they are made in writing. *See* 11 U.S.C. § 523(a)(2)(A) and (B).

The evidence at trial did prove multiple examples of outright lies that Wildenstein told to Zebede (or that she caused Klein to tell to Zebede) after the first check bounced in January 2018. These lies included statements that Wildenstein still had possession of the Jewelry (which she did not), that she had sent payments (which she had not done), that she would soon send payments (which she did not intend to do), and that Wildenstein could and would return the Jewelry to Zebede if he so desired (which Wildenstein has stipulated she could not have done). The problem, for Regal, is that these misrepresentations occurred after January 2018. They kept Zebede at bay, but they were not the means by which the Jewelry was obtained or by which the original extension of credit was obtained.

On the other hand, the "false pretenses" charge perfectly fits the conduct in which Wildenstein engaged. "[F]alse pretense involves an implied misrepresentation or conduct intended to create and foster a false impression" as opposed to an express misrepresentation. *Minority Equity Capital Corp. v. Weinstein (In re Weinstein)*, 31 B.R. 804, 809 (Bankr. E.D.N.Y. 1983). A debtor who purposefully creates a contrived and misleading understanding of a transaction in order to induce an extension of credit has obtained credit by false pretenses. *Evans v. Dunston (In re Dunston)*, 117 B.R. 632, 641 (Bankr. D. Colo. 1990), *aff'd in part, rev'd in part*, 146 B.R. 269 (D. Colo. 1992). Proof of false pretenses does not necessarily require proof of overt misrepresentations. Instead, omissions or a failure to disclose on the part of the debtor

14

can constitute false pretenses where the circumstances of the case are such that omissions or failure to disclose deliberately create a false impression which is known by the debtor. *See Farraj v. Soliz (In re Soliz)*, 201 B.R. 363, 369 (Bankr. S.D.N.Y. 1996). Accordingly, a debt should be excepted from discharge on grounds of false pretenses upon proof of (1) an implied misrepresentation or conduct by the defendant; (2) promoted knowingly and willingly by the defendant; (3) creating a contrived and misleading understanding of the transaction on the part of the plaintiff; (4) which wrongfully induced the plaintiff to advance money, property or credit to the defendant. *In re Selig*, 2018 WL 889350, at *7.

The evidence shows, and I so find, that Wildenstein actually wanted to obtain the Jewelry from Zebede in November 2017 so that Wildenstein and Klein could use the Jewelry as collateral for short-term, high-interest loans from a pawn broker. Wildenstein did not disclose that fact to Zebede. Instead, Wildenstein deliberately led Zebede to believe that she wanted the Jewelry because she admired it and wished to purchase it for her own continued possession, use and enjoyment. In short, Wildenstein deliberately misled Zebede as to her true motives and intent and deliberately created a contrived and misleading understanding of the purpose and the risks of the transaction, knowing that she had deceived Zebede and with the intent to deceive him. She used that contrived and misleading understanding to induce Zebede to sell the Jewelry to her and to do so in exchange for four post-dated checks. Zebede justifiably relied on Wildenstein's representations and on the impression of the transaction that she falsely and deliberately created. I find that Zebede would not have sold the emerald and diamond suite to Wildenstein, and would not have extended credit by accepting post-dated checks, if Zebede had known that Wildenstein's true desire and plan was to obtain valuable property from Regal that Wildenstein could deliver to a pawn broker. I find in addition that Zebede would not have sold the additional

15

$18,000 diamond chain on credit if he had known of Wildenstein's and Klein's plans to pawn the emerald and diamond suite. As noted above, Wildenstein's counsel acknowledged at trial that it is likely that Zebede would have refused to provide credit, and would have refused to accept the post-dated checks, if he had understood Wildenstein's true intent and plans. Zebede delivered the property to Wildenstein, and extended credit, because he was deliberately misled as to the purpose of the transaction and as to Wildenstein's plans, and the unpaid debt to Regal was incurred as a direct and proximate result of the false pretenses that Wildenstein created.

### III.  Other Requests for Relief.

In its complaint, Regal also asked for attorneys' fees, costs and pre-judgment interest. No basis for an award of attorneys' fees has been offered and no proof was offered as to what attorneys' fees were incurred. If Regal believes that an application for attorneys' fees is appropriate under Rule 7054 it should make a timely application for the same. Similarly, after judgment has been entered Regal should file an appropriate application for any award of costs that it seeks.

The United States Supreme Court has held that if money or property has been obtained by fraud the entire "debt" associated with that liability is excepted from discharge, including treble damages, attorneys' fees (if applicable) and other relief to which the creditor is entitled. *See Cohen v. de la Cruz*, 523 U.S. 212, 223 (1998). If a creditor's claim is excepted from discharge, then whatever right the creditor has to prejudgment interest on that claim also is excepted from discharge. *See Tamman v. Schinazi (In re Schinazi)*, No. 06-10226 (BRL), 2010 Bankr. LEXIS 5111 at *49 (Bankr. S.D.N.Y. 2010). However, in this case the pretrial order and other papers submitted by the parties contained no proposed calculation of pre-judgment interest, no discussion of whether the interest rate should be governed by federal or state law, and no

16

discussion of the date(s) from which interest should be calculated – for example, whether interest should run from the date the checks were delivered, or whether interest should run only from the date when each of the four-post-dated checks was supposed to be presented for payment. The Court is therefore unable, on the present record, to identify the amount of the debt that is to be excepted from discharge. The parties are hereby directed to file supplemental submissions on these questions by no later than 5:00 p.m. on April 2, 2021.

## Conclusion

For the foregoing reasons, I hold that Wildenstein obtained the Jewelry (and induced Regal to extend credit) by false pretenses, and that the debt that Wildenstein owes to Regal arising out of her acquisition of the Jewelry from Regal is excepted from discharge. The parties are directed to file supplemental submissions on the prejudgment interest questions that are described above. The entry of judgment will be deferred pending a determination of the prejudgment interest issues.

Dated: New York, New York
      March 24, 2021

                                                <u>s/Michael E. Wiles</u>
                                                **HONORABLE MICHAEL E. WILES**
                                                **UNITED STATES BANKRUPTCY JUDGE**